J. LESTER KINNEY, Plaintiff, v. FREDERICK J. LISMAN and Others, Doing Business as Copartners under the Name and Style of F. J. LISMAN & Co., Defendants.

Supreme Court, Erie County, April 25, 1933.

*Frank G. Raichle*, for the plaintiff.

*Cravath, deGersdorff, Swaine & Wood* [*Thomas T. Cooke* and *Elmer E. Finck* of counsel], for the defendants.

HARRIS, J. This is an action brought in equity by the plaintiff, who claims to be a purchaser of stock, against the defendants who he claims sold him the stock, and is one to rescind his executed contract of purchase on the ground that the agent of the plaintiff, a firm known as Glenny, Monro & Moll, through bribery, had been secretly employed in such purchase by the defendants. The transactions complained of are two in number and involve the dealing in stock of the Consolidated Automatic Merchandising Corporation, commonly known in the market, and hereinafter designated, as Camco.

In June, 1928, occurred the inception of Camco and subsequently thereafter its stock was placed on the market. The first public offering of securities was made through the defendants on August 7, 1928, and was in units of one share of preferred stock and one share of common stock at a price of fifty-five dollars a unit. The defendants comprised an investment banking concern known as F. J. Lisman & Co., and at the time of the transactions in question Glenny, Monro & Moll were a copartnership having their office in the city of Buffalo and doing business both as dealers in investments and stockbrokers. In conjunction with the original marketing of Camco, Glenny, Monro & Moll, by agreement dated August 1, 1928, became one of a number of firms who assumed the marketing of the stock as a selling group in conjunction with F. J. Lisman & Co., and by such agreement Glenny, Monro & Moll became entitled to purchase for resale on its own account units of 1,000 each.

The first transaction complained of by the plaintiff in so far as this action is concerned was the selling of 100 units, and this occurred while Glenny, Monro & Moll were working with the defendants under such selling group agreement. The plaintiff, a well-known lawyer having his offices in Buffalo, like many others, was engaged in ventures in the stock market and for a number of years prior to September, 1928, had carried an account with Glenny, Monro & Moll. His contact with that firm was through a representative thereof named Balkin, evidently a friend of the plaintiff, and the person with whom he conducted most of his transactions with Glenny, Monro & Moll.

In September, 1928, apparently through his contacts with Balkin, the plaintiff became interested in Camco. Balkin furnished the plaintiff with data concerning Camco and such data included a circular (Plaintiff's Exhibit 6 herein), which particularly stated that the stock of Camco was offered in units as above described. As a result of these dealings with Balkin, the plaintiff bought 100 units of the stock. He states that he directed Balkin to purchase such units on the Curb Market (although Balkin disputes this) and

claims now to be entitled to rescind such sale of 100 units on the ground that Glenny, Monro & Moll were being paid a secret profit of two dollars and a half per share on each unit and that he was not advised of such secret profit. In reference to such 100-unit transaction, the evidence is strongly in favor of the contention of the defendants that the plaintiff purchased such 100 units from Glenny, Monro & Moll as dealers and not as brokers. This being so, he should have known that a dealer must get his compensation somewhere and logically that such compensation must come from a profit. This being so, the court cannot permit him to rescind the purchase of the 100 units.

Following the transaction of the 100 units, the plaintiff had another deal in Camco with Glenny, Monro & Moll which deal took place in January, 1929, at which time he purchased 200 shares of preferred stock. Within a few days thereafter he sold such 200 shares. He does not complain of this second transaction in Camco and it is only referred to because it may throw some light upon the other transactions and upon the likelihood that the plaintiff relied as much as he says he did on the judgment of Glenny, Monro & Moll. He does say that in reference to the initial transaction of 100 units in Camco and the one hereinafter described, he relied implicitly on the judgment and advice of Glenny, Monro & Moll, and that he was practically controlled in his decisions to market the 100 units and the 500 shares of preferred stock hereinafter referred to by such advice of Glenny, Monro & Moll.

In February, 1929, the plaintiff had a third transaction in Camco with Glenny, Monro & Moll and the rescission of this third transaction is the burden of his cause of action alleged in the complaint other than the cause of action in reference to the 100 units. This transaction of 500 shares has been the subject of previous litigation in which the present plaintiff was the plaintiff and in which Glenny, Monro & Moll were the defendants. In such previous litigation, the plaintiff brought an action against Glenny, Monro & Moll to rescind his purchase of the 500 shares on the ground that he had ordered them as his brokers to purchase the 500 shares on the Curb Market for him and that instead of that, they had sold him 500 shares of Camco owned by themselves. In such action the plaintiff had judgment at Equity Trial Term (*Kinney* v. *Glenny*, 136 Misc. 301). In the decision on which such judgment was based the learned trial court held that the defendants therein were owners of the 500 shares; that the plaintiff had ordered from them as his brokers the purchase of 500 shares and that the then defendants, in violation of their duty to the plaintiff, sold their own stock to the plaintiff. If these

were the facts, there could be no quarrel with such decision at Trial Term. But on appeal it was held by the learned appellate courts that the facts did not warrant the conclusion that Glenny, Monro & Moll were the owners of such 500 shares at the time they furnished the same to the plaintiff (231 App. Div. 311; affd., 257 N. Y. 560). The case of *Kinney* v. *Glenny* is the subject of a long discussion in an article entitled " Secondary Distribution of Securities — Problems suggested by *Kinney* v. *Glenny* " (Vol. XLI, Yale Law Journal, 949, No. 7, May, 1932). This article is most informative on the subject involved, both as to methods of marketing and authorities on the law of agency quoted. The writers of this article do not agree with the conclusion of the learned appellate courts to the effect that ownership of the 500 shares was not in Glenny, Monro & Moll, but in so disagreeing they apparently overlook the fact that a purchase by Glenny, Monro & Moll, if made by them as brokers for a customer, was a purchase to put title in such customer and not in the brokers.

The facts concerning such 500 shares and their purchase, although disputed in some respects, were practically as follows: The original marketing of Camco in the summer and fall of 1928 was what is referred to ordinarily as a primary distribution of the stock. Such original distribution did not result in a condition of the market that was beneficial to the bankers and others interested in the stock, in that persons purchasing the units broke the same up and putting the shares on the market, brought about a surplus of the stock on the market. To overcome this situation, the defendants herein, as principal bankers of such stock, in an endeavor to protect the market, became purchasers on the open market of the stock as it appeared and on the resale of such purchases endeavored to place it in the hands of investors who would hold the same, and not in the hands of speculators who would return it to the market at a time inopportune to the keeping up of the price of the stock. It was during this effort on the part of the defendants that Glenny, Monro & Moll received from the plaintiff his order for 500 shares of preferred stock of Camco. This order came to Glenny, Monro & Moll through the relationship existing between Balkin and the plaintiff herein. The plaintiff claims he was solicited by Balkin; Balkin claims that the plaintiff voluntarily gave the order. The plaintiff claims that he told Balkin to buy 500 shares on the Curb Market at 35½ or better; Balkin says that although the number of shares and the price were specified, the Curb Market was not.

In view of the many transactions had by the plaintiff with Glenny, Monro & Moll other than Camco and in view of the fact that the plaintiff received what he ordered, *i. e.*, 500 shares of preferred stock

at 35½ (which was the best price that could be obtained at that time)' the court is not inclined to give weight to the question as to whether or not the purchase was to be made on the Curb Market. After Balkin received the order from the plaintiff for such 500 shares, he transmitted it to his office. On the receipt of the same, one Doolittle, a member of the firm of Glenny, Monro & Moll, called up by long distance telephone the defendants in New York and had, in substance, with one Traugott, one of the defendants above named, a conversation as follows: Doolittle: " I have an order to buy 500 shares of stock; what is the market price? " Traugott: " Stock today is offered at 36 and the bid is 35 for the same and we will let you have 500 shares at 35½." It cannot be disputed that 35½ was the best price at which such stock could be purchased on that day on the curb, over the counter or from a private seller. Traugott further said, in substance, " for sixty days placement, you will receive one point concession."   .

Although the past several years have given the layman an opportunity to learn a great deal of the jargon peculiar to the stock market, it probably is best to translate the words last quoted into what apparently was their meaning in the language more familiar to the general public. The statement " for sixty days placement, you will receive one point concession" meant that out of the price of $35.50 a share, Glenny, Monro & Moll were to retain $1 per share for sixty days, and if, during such sixty days, such 500 shares of stock, or any part thereof, were sold on the market, then Glenny, Monro & Moll were to remit at the rate of $1 to the defendants herein for each of such 500 shares as were sold on the market within such sixty days. If such 500 shares were kept off the market during such sixty days, then Glenny, Monro & Moll were to retain the sum of $500. This arrangement was confirmed in writing as follows:

" F. J. Lisman & Company
Members New York Stock Exchange
Investment Securities
Forty-Four Wall Street
New York

" *February* 13*th*, 1929.

" Messrs. Glenny, Monro & Moll,
Liberty Bank Bldg., Buffalo, N. Y.

" Dear Sirs: In accordance with telephonic advices of even date, we are pleased to confirm sale to you of: 500 shares Consolidated Automatic Merchandising Corporation, Preferred Stock at 35½ less 1 point concession to you.

" It is understood that you are to protect the above numbers for

a period of sixty days, reimbursing us the 1% per share allowed at time of delivery, should any of the above numbers be repurchased in the open market at or below the price of 35½ per share.

"Please sign the duplicate of this letter signifying your acceptance of these terms, and return same to us for our files.

AM                              "Very truly yours,

"Our purchase of this stock is made in accordance with the above terms.

"Signed GLENNY, MONRO & MOLL"
(Stamped on letter.)

"Feb. 14 1929
Received M. & R. Dept.
Feb. 16, 1929
Assgnd. to Sat.
Ans'd by /"

The above written confirmation is Exhibit 7 in evidence herein. Following such confirmation, Glenny, Monro & Moll sent to the plaintiff herein a letter (Exhibit 1 herein) which was as follows:

"GLENNY, MONRO & MOLL
Investment Securities
Liberty Bank Building
Buffalo, N. Y.

"*February* 13, 1929.

"Mr. J. LESTER KINNEY
752 Ellicott Square, Buffalo, New York

"We take pleasure in confirming sale to you to-day of

|  | Debit | Credit |
|---|---|---|
| "500 shs. Consolidated Automatic Merchandising Corp. Pfd. @ 35½ ...... | $17,750 00 |  |
| Plus Commission ................... | 75 00 |  |
|  | $17,825 00 |  |

Balance Due
Payment Due on or Before ........................
If paid after this day add .......per day

"Yours very truly,
"GLENNY, MONRO & MOLL
"J. D. FARRINGTON."

It will be noted from such Exhibit 1 that the plaintiff was charged a commission of seventy-five dollars by Glenny, Monro & Moll and this fact establishes to the satisfaction of this court that in this

transaction involving 500 shares, Glenny, Monro & Moll were brokers and acting as agents for the plaintiff herein.

At first, such 500 shares were carried on margin by Glenny, Monro & Moll for the plaintiff, but in June, at their request, the plaintiff paid for the stock. He received and accepted dividends on such 500 shares. At no time prior to August 23, 1929, was he advised of the arrangement in reference to the one dollar per share. During the sixty days following this transaction of 500 shares, there was frequent conversation between the plaintiff and representatives of Glenny, Monro & Moll in reference to the market on the preferred stock and the plaintiff claims that he kept such stock from the market because he was advised by Glenny, Monro & Moll to do so. That they gave such advice they denied.

Concerning this alleged operation of mind of the plaintiff, I am unable to find sufficient proof in the record to make a finding that the plaintiff kept such stock off the market solely because he was led to do so by the urgency of Glenny, Monro & Moll. The plaintiff was an active customer on the market, dealing in what, for a professional man, would appear to be large transactions and it is to be presumed that he used his own judgment largely as to what he did do on the market. In addition to this, if the plaintiff sought advice from Glenny, Monro & Moll as to the marketing of such 500 shares, he was the one to choose them as his advisers and there can be no reason to hold the defendants herein for his seeking advice from Glenny, Monro & Moll. From February 13, 1929, to the end of April of that year (which period includes the sixty days to which reference has been made above), the weekly low and high quotations for preferred shares of Camco were as follows:

| | Low | High |
|---|---|---|
| February 15 | 35 | 36 |
| February 21 | 34 | 36 |
| March 1 | 34 | 36 |
| March 8 | $32\frac{3}{4}$ | 36 |
| March 15 | $32\frac{1}{4}$ | 34 |
| March 22 | $32\frac{1}{2}$ | $33\frac{3}{4}$ |
| March 29 | 28 | $32\frac{1}{4}$ |
| April 5 | 27 | 32 |
| April 12 | 25 | $27\frac{7}{8}$ |
| April 19 | $25\frac{1}{8}$ | 34 |
| April 26 | $30\frac{7}{8}$ | $34\frac{7}{8}$ |

Later, the market in Camco started to go down, finally became involved in the crash of 1929 and since that time the value of the shares has become of small moment, if of any. The high and low

quotations weekly beginning with the first of May until the end of August, 1929, were as follows:

| | Low | High |
|---|---|---|
| May 3 | 29 | $30\frac{7}{8}$ |
| May 10 | 28 | $31\frac{7}{8}$ |
| May 17 | $27\frac{1}{2}$ | $28\frac{3}{4}$ |
| May 24 | $24\frac{1}{8}$ | $27\frac{1}{2}$ |
| May 31 | 25 | 26 |
| June 7 | $21\frac{5}{8}$ | $25\frac{3}{8}$ |
| June 14 | 18 | $21\frac{1}{2}$ |
| June 21 | $17\frac{1}{8}$ | $22\frac{1}{2}$ |
| June 28 | 22 | 26 |
| July 5 | $17\frac{5}{8}$ | $23\frac{7}{8}$ |
| July 12 | 12 | $19\frac{1}{8}$ |
| July 19 | 11 | $14\frac{7}{8}$ |
| July 26 | $10\frac{1}{4}$ | $14\frac{7}{8}$ |
| August 2 | $10\frac{1}{8}$ | $12\frac{1}{8}$ |
| August 9 | $10\frac{1}{2}$ | $16\frac{1}{2}$ |
| August 16 | $14\frac{1}{8}$ | 17 |
| August 23 | $14\frac{5}{8}$ | $16\frac{1}{8}$ |
| August 30 | $14\frac{1}{4}$ | 15 |

The plaintiff claims he became suspicious of the 500-share transaction about August, 1929, and at that time he served demands on Glenny, Monro & Moll for detailed information as to the transaction and he received from them two letters, of which the following are copies, which letters are Exhibits 3 and 4 herein:

" PLAINTIFF'S EXHIBIT 3.

"*August* 20, 1929

"Mr. J. LESTER KINNEY,
742 Ellicott Square, Buffalo, N. Y.

" DEAR SIR: We regret due to the absence of many of our employees on account of vacations, that we have been unable to answer your inquiries of the 14th and 19th inst. before this time.

" We are pleased to furnish you with the following information:

" 1. The name of the person from whom 500 shares of Consolidated Automatic Merchandising Corporation Preferred Stock confirmed to you February 13, 1929, was purchased, is F. J. Lisman & Company, 44 Wall St., New York City.

" 2. The stock was purchased February 13, 1929, but we are unable to advise you of the exact time at which the transaction took place for the reason that the order was executed by long distance telephone. We have taken steps to ascertain the exact time but are informed by the Telephone Company that these records

have been filed away and it will take about three days to secure this information. As soon as we receive this, we will advise you.

" 3. The place at which purchased was New York City.

" 4. The amount of stock purchased was 500 shares of Preferred Stock.

" 5. The price at which the same was bought, was $17,750.00.

" Very truly yours,

WJM:U                                   " GLENNY, MONRO & MOLL."

" PLAINTIFF'S EXHIBIT 5.

"*August* 23, 1929.

" Mr. J. LESTER KINNEY,
                752 Ellicott Square, Buffalo, N. Y.

" DEAR SIR: Owing to an error inadvertently made by one of our accountants, we desire to supplement the statement sent to you August 20, 1929, by striking out Sub-division 5 and stating in lieu thereof, the following:

" 5. The price at which the same was bought was $35.50 per share less 1 point concession, with the understanding that we were to protect the above mentioned stock sold to you for the period of 60 days, reimbursing F. J. Lisman & Co. the 1% per share allowed at the time of delivery should any of the above stock be re-purchased in the open market at or below the price of $35.50 per share.

" Very truly yours,

" GLENNY, MONRO & MOLL

WJM:U                                   " S. J. MONRO."

Based on the information contained in Exhibits 3 and 4, the plaintiff brought the action of *Kinney* v. *Glenny*, above referred to. Such action was tried at Equity Term in January, 1930, and the appeal to the Court of Appeals was disposed of by the order of the Court of Appeals made on October 20, 1931. On the trial of such action the plaintiff received more full information as to the conversations and correspondence between Doolittle and Glenny, Monro & Moll on one side and Traugott, as representative of the defendants, on the other side. His information on this subject has not been added to since that trial.

In February, 1932, and after the affirmance by the Court of Appeals of the reversal by the Appellate Division of the Trial Term, the plaintiff commenced this action. In his complaint he pleads two causes of action, the first therein stated being based on the 500-share transaction and the second therein stated being based on the 100-unit transaction. He offers to return the 100 units and the 500 shares of preferred stock and the dividends received by him on such stock and such offer was repeated on the trial.

In reference to the 100 units, he alleges that the defendants herein bribed Glenny, Monro & Moll, whom he claims were his agents for such transaction, to sell the 100 units of such stock, but as the court has indicated above, this transaction was a purchase by the plaintiff from Glenny, Monro & Moll, and not a brokerage transaction, and, therefore, not the subject of rescission in this action.

In the complaint the plaintiff stresses the alleged bribery of his agent as being the ground for his right to rescind, but on trial he goes further and endeavors to establish his right to rescind not only because of alleged bribery of his agent but also, in reference to the 500-share transaction, because the arrangement for the sixty-day placement was one that necessarily would interfere with the exercise of the duty of absolute fidelity owed him by his agent. There can be no doubt that in employing Glenny, Monro & Moll as his agents to purchase the 500 shares, the plaintiff had a right to assume that the agents would not enter other service or do anything else that would interfere with the carrying out of his commission. If the commission were one that required the exercise of discretion, then certainly the agent could not take employment from a third party that would interfere with such discretion. The agent was under a duty to perform exactly what the customer ordered performed, that is, to purchase for him 500 shares of Camco preferred stock at $35\frac{1}{2}$ or at a better price if it could be obtained at that time. The agents had a duty to perform their task with reasonable diligence and skill and could undertake no other arrangement for any one else that would interfere with that task. They had no right to sell to the plaintiff their own stock. Specifically, they could not accept a bribe or gratuity from a third party which would interfere with their performing their entire duty to their customer. If the agents violated these duties as specified in this paragraph, then the plaintiff would be entitled to rescind his contract with the party from whom the 500 shares were purchased, even if that party were innocent of knowledge or wrongful intent in the transaction. (Mechem Agency [2d ed.], § 2139; *Empire State Ins. Co.* v. *American Central Ins. Co.*, 138 N. Y. 447; *Wendt* v. *Fischer*, 243 id. 439; see Penal Law, § 439; *Sirkin* v. *Fourteenth Street Store*, 124 App. Div. 384; *Goodrich* v. *Houghton*, 134 N. Y. 115, and *Donemar, Inc.*, v. *Malloy*, 250 id. 360.) The remedy of rescission is a drastic one and should be applied with care that an innocent party does not suffer through the delinquency of an agent, which has nothing to do in bringing about or carrying out the transaction for which he is employed. Otherwise injustice would take the place of justice. It is in the light of these claims and these rules so stated that the court now passes on the right of the plaintiff to rescind the purchase of the 500 shares

from the defendants. Certainly even though the arrangement of one dollar a share were a bribe, the purchase by the plaintiff and the sale by the defendants of the 500 shares was not induced or in any way brought about by the bribe. The plaintiff ordered the purchase of 500 shares at 35½ or better and such a purchase was made for him. Was there anything else in the transaction that caused the agents to deviate from their duty of absolute fidelity to the plaintiff? It has been held (See *Kinney* v. *Glenny, supra*) that they did not sell him their own stock. So if this last question is to be answered affirmatively, it must be so answered because the agents agreed to something that gave plaintiff a bargain that he did not desire to make. If the arrangement made had been one that would require the plaintiff to hold the 500 shares of stock for sixty days, then clearly such an arrangement would differ from that authorized by the plaintiff and would entitle him to rescind his purchase. But the arrangement was not one that required him to hold the 500 shares for sixty days. It was an agreement on the part of the agents that if, for any reason, the stock came back on the market within sixty days, they would lose $500. They did not agree that the stock would not come back on the market.

The morality of the arrangement might be criticised in that it placed the agents in the position (through the act of the defendants) where there was an inducement to the agents to advise the plaintiff not to sell the 500 shares during the sixty days next succeeding the day of purchase. Then comes the inquiry, did the original employment of the agents by the plaintiff to purchase the 500 shares include in such employment the right of the plaintiff to call on such agents for advice as to the future marketing of such shares? In the opinion of the court, such employment did not include the right to such advice. The asking for advice, the giving of the same and the taking of the same in the stock brokerage business are largely matters of volition and good will on the part of the customer and the agents. There undoubtedly would be cases of agents who gave improper advice who would be liable to the customer for the result of such advice, and it may be that along this line the plaintiff has a cause of action against such agents for giving him advice not to sell when their advice was affected by their personal interest, but that would be another lawsuit; and it may be that if this agreement between the defendants herein and the agents was the inducing cause for such advice, that the plaintiff herein could join such defendants in that type of action on the claim that they had induced the agent to give improper advice. But what the court is concerned with herein is whether the agreement between the agents and the

defendants was one that interfered with the duty of the agents to carry out in utmost fidelity the order of the plaintiff to purchase the 500 shares at 35½ or better. The agents have performed that duty and it cannot be said that they were interfered with in any way in such performance by the defendants.

The court is, therefore, of the opinion that the transaction involving the 500 shares was not of the type of transaction which would permit the plaintiff to rescind the same as against the defendants. In view of the foregoing, the complaint is dismissed.